Hassan A. Zavareei (SBN 181547)
Anna C. Haac (to be admitted *pro hac vice*)
Andrew J. Silver (to be admitted *pro hac vice*)
TYCKO & ZAVAREEI LLP
1828 L. Street, NW, Suite 1000
Washington, D.C 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com
        ahaac@tzlegal.com
        asilver@tzlegal.com

Tanya Koshy (SBN 277095)
TYCKO & ZAVAREEI LLP
483 Ninth St., Suite 200
Oakland, CA 94607
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
Email: tkoshy@tzlegal.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE CUMMING, LAMESHA KONDO, ANDREA MENDEZ, and TAMMY WANGELINE, on behalf of themselves and all individuals similarly situated, | Case No. 5:18-cv-03476 |
| Plaintiffs, | |
| v. | (JURY TRIAL DEMANDED) |
| BIG PICTURE LOANS, LLC; MATT MARTORELLO; and ASCENSION TECHNOLOGIES, INC., | **CLASS ACTION COMPLAINT** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs, Christine Cumming, Lamesha Kondo, Andrea Mendez, and Tammy Wangeline ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, allege as follows:

## INTRODUCTION

1.     Defendants have been hiding behind illegal usurpation of tribal authority, using what is often referred to a "rent-a-tribe" scheme, to systematically violate state usury laws. Specifically, the Defendants set up a payday lending operation that associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe.

2.     To set up this scheme designed to circumvent state and federal usury laws, Defendant Matt Martorello ("Martorello") approached the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") for the purpose of establishing a rent-a-tribe scheme. Pursuant to that scheme, Defendants made high interest loans in the name of Big Picture Loans, LLC ("Big Picture Loans"), which claim to be owned and operated by the Tribe. But in reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital") funded the loans, controlled the underwriting, and handled the day-to-day operations of the business. In return for the use of its name, the Tribe received a measly 2% of the revenue,[1] and the Tribe had no control over the income or expenses of Big Picture Loans.

3.     This lawsuit challenges the legality of Defendants' loans and seeks to enforce Plaintiffs' home states' public policy against usurious loans. Further, Plaintiffs seek a judgment declaring that the loan agreement's choice-of-law and forum selection provisions are unenforceable as a matter of public policy and because the provisions attempt to deprive consumers of both a remedy and of a day in court.

4.     Plaintiffs also seek an injunction against all Defendants, prohibiting them from lending or collecting loans in their home states, as well as actual damages and treble damages from Defendants Big Picture, Ascension Technologies, and Martorello for their participation in the unlawful lending enterprise, which violated state usury laws, unjustly enriched the Defendants, and

---

[1] Zeke Faux, *Payday Lenders are Changing the Game Ahead of a U.S. Crackdown,* Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue, according to documents provided by a person involved in the deal."), https://www.bloomberg.com/news/articles/2016-02- 04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown.

violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

5.     As a result of their participation in the enterprise, Big Picture, Ascension Technologies, and Martorello violated the usury laws of California, Ohio, Texas, and Wisconsin, along with RICO's prohibition against the "collection of unlawful debt," which RICO defines as a debt incurred in "the business of lending money" where "the usurious rate is at least twice the enforceable rate" under State or Federal law. 18 U.S.C. § 1961(6). Thus, Plaintiffs also seek to recover damages on behalf of themselves and the RICO Class set forth below.

## JURISDICTION

6.     The Court has jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. The court also has jurisdiction under the Class Action Fairness Act because Plaintiff Cumming is a California citizen, at least one defendant is not a California citizen, the matter in controversy exceeds $5,000,000, and there are at least 100 class members.

7.     Venue is proper in this Court under 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

8.     Plaintiff Christine Cumming is a natural person and resident of California and this District.

9.     Plaintiff Lamesha Kondo is a natural person and resident of Ohio.

10.    Plaintiff Tammy Wangeline is a natural person and resident of Wisconsin.

11.    Plaintiff Andrea Mendez is a natural person and resident of Texas.

12.    Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Big Picture Loans and did not fund the loans or handle the servicing or collection of the

loans. Big Picture Loans was formerly known as Red Rock Tribal Lending, LLC, who did business under the domain name www.castlepayday.com.[2] Big Picture Loans is the successor in interest of Red Rock.

13.     Defendant Martorello is a natural person and claims to be a resident of Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

14.     Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC was a limited liability company previously organized under the laws of the U.S. Virgin Islands and then Puerto Rico. Bellicose Capital was formed by Martorello in 2011 to make the usurious loans. Although Defendants held it out as a "managing consulting company," Bellicose Capital was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans, which was then funneled to Martorello. Due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred Bellicose to the Tribe in April 2016 in an attempt to shield Bellicose Capital's illegal business practices. The Tribe rebranded Bellicose as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe.

## FACTUAL BACKGROUND

**A.     Plaintiffs' Home States' Prohibitions Against Usurious Loans.**

15.     "Usury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations." 13 Robert R. Rickett, *California's Model Approach to Usury,* 18 Stan. L. Rev. 1381 (1966).

16.     In California, the prohibitions on usury are enshrined in the California Constitution, limits the interest payable "[f]or any loan or forbearance of any money." Cal. Const. Art. XV § 1.

17.     Thus, "unless a lender falls into one of the exemptions approved by the state

---

[2] Castle Payday, *We Have Big News! Castle Payday is now Big Picture Loans*, https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited June 11, 2018).

legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. ea Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing CAL. CONST. ART. XV § 1).

18.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.* (citing Cal. Civ. Code § 1916–2).

19.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

20.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

21.     Under Ohio's small loan law and newly enacted Consumer Installment Loan Act, a person or business operating without a license from the Ohio Division of Financial Institutions may not charge interest in excess of the general maximum amount of interest available under state law. Ohio Code § 1321.02; § 1321.63(a). The generalized maximum rate of interest under Ohio law is 8%. Ohio Code § 1343.01(A).

22.     Even *licensed* lenders making small loans of $5,000 or less in Ohio are subject to strict interest rate ceilings. Licensed lenders may contract for interest rates of up to 28% on the portion of principal not exceeding $1,000, and up to 22% on the portion of principal exceeding $1,000. Ohio Code § 1321.13. And the newly enacted Ohio Consumer Installment Loan Act provides an interest rate ceiling of 25%. Ohio Code § 1321.68.

23.     Ohio's small loan law and Consumer Installment Loan Act both render void any loans made in violation of the laws, and a lender violating the law "has no right to collect, receive, or retain any principal, interest, or charges." Ohio Code §§ 1321.02, 1321.63.

24.     Willful violators of Ohio's small loan law are liable to borrows for twice the amount

of interest contracted for. Ohio Code §§ 1321.14(D).

25.     Under Wisconsin law, weekly or monthly installment loans are subject to interest rate limitations of 6%, and other loans are subject to interest rate limitations of 12%. Wis. Stat. § 138.05(1). Consumers may recover from lenders charging in excess of these limitations all interest and charges, and up to $2,000 in principal. Wis. Stat. § 138.06.

26.     And under Texas law, loans are subject to maximum interest rates of 10%. Tex. Fin. Code § 302.001. Consumers in Texas are entitled to recover from lenders charging over the legal limits the greater of (a) three times the interest charged in excess of 10%, or (b) the lesser of $2,000 or 20% of the principal. Tex. Fin. Code § 305.001. Additionally, if the creditor "charges and receives interest that is greater than twice the amount authorized," the consumer is also entitled to recover the principal amount and the interest and any other charges or fees. Tex. Fin. Code § 305.002.

**B.     Defendants Established an Enterprise to Evade Usury Laws.**

27.     Under RICO's provisions, a plaintiff establishes RICO liability by demonstating that an "enterprise" engages in interstate or foreign commerce to participate in a pattern of conduct that results in the collection of unlawful debts, or by conspiring to do so. 18 U.S.C. §§ 1962(c), (d). As discussed herein, Defendants' and other unnamed individuals participated in an enterprise that illegally sought to evade usury laws under the a wrongful disguise.

28.     Over the last decade, businesses have sought to evade state lending laws like California's, Ohio's, Texas's, and Wisconsin's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

29.     Defendant Matt Martorello recognized the exorbitant profits he could achieve by not complying with state usury laws and lending out high interest loans to some of the country's most vulnerable consumers.

30.     In order to effectuate this plan, Martorello established a rent-a-tribe business model

for his company, Bellicose Capital, associating themselves with the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally recognized tribe located in the Upper Peninsula of Michigan.

31.    Martorello and Bellicose helped form Big Picture Loans and Red Rock—two companies formed as "business enterprises" of the Tribe, which claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."[3]

32.    Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front, and Bellicose Capital provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

33.    The Tribe had no control over the income or expenses of either Red Rock or Big Picture Loans.

34.    Instead, the Tribe allowed Defendants to use their name as a front and, in return, received a nominal 2% flat fee of the revenue. Delvin D. Hawley, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.").

35.    Upon information and belief, tribal members do not participate in the day-to-day operations of Red Rock or Big Picture Loans and nearly all the activities associated with these companies occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

36.    The loan agreements falsely claim that Big Picture Loans and Red Rock were owned and operated by the Tribe. Instead, Bellicose Capital was the *de facto* owner and controlled the operations of the Big Picture Loans and Red Rock.

---

[3] *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Resolution # T2014-066, Approving the Creation of the Wholly Owned and Operated Lending Entity—Big Picture Loans, LLC (Aug. 26, 2014), http://www.lvdtribal.com/pdf/BPL%20Organizing%20Documents.pdf.

37. Indeed, Big Picture and Red Rock's activities were carried out by officers and employees of Bellicose from its operations in the Virgin Islands, Puerto Rico, and the Philippines.

38. The money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Bellicose Capital and Martorello, and neither the Tribe nor its officials were allowed to access the accounts.

39. Additionally, Bellicose Capital also handled the lead generation processes used to identify and solicit potential consumers.[4]

40. Indeed, Martorella developed Bellicose Capital's lead generation procedures.

41. In the past few years, federal regulators have begun cracking down on rent-a-tribe arrangements.

42. For example, the United States Attorney for the Southern District of New York indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein. Tucker and Muir were convicted in October 2017 and sentenced in early 2018. *See* https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday (last visited June 11, 2018).

43. The Tucker indictment, which sets out a strikingly similar set of facts, alleged: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Dot. 1 at ¶¶ 1–3).

---

[4] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_prac-tices_in_internet_payday_lending.pdf. Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need of or qualify for an additional loan. *Id.*

44.     For example, the indictment explains:

> In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

> Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

45.     Just like the Tucker defendants, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by an illusion that Defendants were protected by tribal immunity.

46.     After these rent-a-tribe schemes were uncovered through private lawsuits and governmental enforcement actions against Defendants' competitors, Martorello "sold" Bellicose Capital to the Tribe in an effort to insulate the scheme from liability. Faux, *supra* note 1.

47.     As part of this arrangement, the Tribe paid Martorello $1.3 million dollars, plus he is entitled to receive as much as $300 million in future payments. *Id*. In other words, the Tribe continues to accept a nominal fee in return for the use of its name.

48.     Tucker was the architect of a similar sham sale: before he was criminally indicted for tax evasion and a RICO conspiracy, Tucker initiated a sham sale of his company CLK

management, the company providing services to the payday lender, to the Miami tribe, the Native American tribe supposedly operating the payday lender. The sale supposedly transpired for $120,000.

49.     Yet, following the sale, like Martorello here, Tucker still controlled the daily operations of his company. Additionally, after the sale, other people and entities were listed as the owners of the businesses Tucker had supposedly sold to the tribe.

50.     And while it is now organized under the laws of the Tribe, Ascension Technologies continues to be operated in the same manner and by the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

51.     For example, approximately 20 individuals identify Ascension Technologies as their employers on LinkedIn. However, none of these people are located on the reservation. *See* https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%2212899424%22%5D (last visited June 11, 2018).

52.     Instead, many of them list Atlanta or Puerto Rico as the place where they are located.

53.     Upon information and belief, none of these people are members of the Tribe and nearly all of the activities of Ascension Technologies are performed by these non-tribal members who are not located on the reservation.

**C.     Defendants Made Loans to Consumers Charging Interest Well in Excess of Legal Rates.**

54.     Defendants marketed, initiated, and collected usurious loans in California, Ohio, Wisconsin, Texas, and elsewhere in the United States. Martorello chose California, Ohio, Texas, and Wisconsin as places where loans and collection efforts would ensue, and they participated in and knew of the actions of Red Rock, Big Picture, and Bellicose in those states.

55.     Martorello and the other defendants knew the subject loans were illegal under state law, and for that reason they operated under the auspices of Red Rock, Big Picture, and Bellicose.

56.     In order to qualify for Defendants' loan product, consumers were required to electronically sign a form contract created by Defendants—not created by the Tribe.

57.     Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than the legal APR.

58.     For example, Defendants charged Kondo with an APR of 661.4771%—hundreds of times more than the legal rates set forth under Ohio law, whether the general 8% rate, or the slightly higher rates (22%, 25%, and 28%) available to licensed lenders. Ohio Code §§ 1321.13, 1321.68. Defendants are not licensed in Ohio. Accordingly, Defendants' loans to Kondo and members of the Ohio Class are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loan. Ohio Code §§ 1321.02, 1321.63.

59.     Defendants are additionally liable to Kondo and members of the Ohio Class for twice the interest collected. Ohio Code §§ 1321.14(D). Defendants received at least $1,089.63 from Ms. Kondo, whose initial loan was for $400. The majority of the payments to Defendants were credited toward interest or other fees.

60.     Similarly, Plaintiff Cumming paid Defendants at least $1,026.76 on a loan with principal of $600.00. At least $717.22 of the amount Cumming paid was credited toward interest. Because the interest rate charged to Cumming greatly exceeded 10% (in fact, it exceeded 300%), Plaintiff Cumming and members of the California Class are entitled to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

61.     Likewise, Plaintiff Mendez paid Defendants at least $620.95 on a loan in which the principal was $300.00. The majority of Plaintiff Mendez's payments to Defendants were credited to interest or other fees. Thus, Plaintiff Mendez and the Texas Class are entitled to recover the greater of (a) three times the interest charged in excess of 10%, or (b) the lesser of $2,000 or 20% of the principal. Tex. Fin. Code § 305.001. Additionally, because Defendants charged Plaintiff Mendez and the Texas Class members greater than twice the authorized amount, Plaintiff Mendez and the Texas Class are also entitled to recover the principal amount and the interest and any other

charges or fees. Tex. Fin. Code § 305.002.

62.     Defendants likewise charged Plaintiff Wangeline and the Wisconsin Class members greater than either 6% or 12% in interest. Therefore, Plaintiff Wangeline and the Wisconsin Class members are entitled to recover all interest and charges, and up to $2,000 in principal. Wis. Stat. § 138.06.

63.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c); *see also* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate").

64.     As a result of Defendants' conduct, including participation in the Enterprise, Defendants are jointly and severally liable to Plaintiffs and the RICO Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**D.     Defendants' Loan Agreements Are Void and Unenforceable.**

65.     Because the loans were made without the required state licenses and/or used an annual APR in excess of legal limits, the agreements are void *ab initio*.

66.     As discussed herein, Defendants' loan agreements violate California's, Ohio's Wisconsin's, and Texas's public policies against usury.

67.     Defendants attempt to insulate themselves from liability through choice of law and forum selection clauses that are unenforceable and unconscionable in that their primary purpose is to perpetuate Defendants' "rent-a-tribe" fraud. Upholding Defendants' sham choice of law and forum selection clauses would be against the public policy of California, Ohio, Texas, and Wisconsin as the clauses serve no legitimate purpose, but rather serve merely to perpetuate evasion of state and federal law.

68.     Indeed, the terms of Defendants' choice of law and forum selection provisions themselves seek to disclaim all laws and deprive consumers of their day in court.

69.     For example, Kondo's Loan Agreement provides that the agreement is governed by

tribal law and purports to refer all disputes to a tribal resolution process:

**GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.

\* \* \*

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by You or on Your behalf relating to or arising from this Agreement. . . . The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, if You, in the course of Your otherwise lawful and proper use of Lender's business believes Yourself to be harmed by some aspect of the operation of any part of Lender's business, You must direct Your concerns or dispute to Lender in writing. Your complaint to the Lender will be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of tribal sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of Your written complaint. In the event that You are dissatisfied with the Lender's determination, You may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination.

70.     Cummins, Mendez, and Wangeline's loan agreements contained virtually identical governing law and forum selection clauses.

71.     Upon information and belief, the governing law and forum selection clauses were template language included in all loan agreements involving Red Rock and Big Picture.

72.     Defendants' governing law clause is unenforceable because it violates public policy and was procured through fraud and misrepresentations, including that Red Rock and Big Picture Loans were "wholly owned" and "operated by" the Tribe.

73.     These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

74. In reality, the loans were owned and operated by Bellicose Capital, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

75. Likewise, the forum selection clause is also unenforceable because it seeks to deprive consumers of a remedy and their day in court. Rather than selecting an alternative dispute resolution procedure, Defendants use the forum selection clause as a means of depriving consumers of a remedy and a day in court.

76. For example, the Tribal Dispute Resolution Procedure claims that consumers do not have "any binding procedural or substantive rights" against Big Picture.

77. Additionally, the Tribal Dispute Resolution Procedure purportedly allows consumers to lodge a "Formal Dispute Resolution" with the "Tribal Financial Services Regulatory Authority."

78. But the Formal Dispute Resolution Procedure is a sham. Most notably, the dispute resolution provisions deny the Tribal Financial Services Regulatory Authority subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Financial Services Authority Comm. Regs., Reg. 1.1(B)(4), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last accessed June 11, 2018).[5]

79. In particular, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity to be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." Tribal Financial Services Authority Comm. Regs., Reg. 1.1 § (B)(4)(b).

80. Additionally, the Regulations provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe*." Tribal Financial Services Authority Comm. Regs., Reg.1.1 § 4(c) (emphasis added).

---

[5] Certain of the links to the provisions included in the loan agreement for Plaintiff Kondo do not work and are otherwise confusing.

81.    In essence, Defendants used the forum selection and choice of law clauses to convert it into "a choice of no law clause." *Hayes v. Delbert Servs., Corp.*, 811 F.3d 666, 675 (4th Cir. 2016.)

82.    Accordingly, Plaintiffs request the Court to enter a declaratory judgment that the governing law and forum selection provisions are unenforceable.

## CLASS ACTION ALLEGATIONS

83.    Plaintiffs assert their claims on behalf of the proposed Classes defined as follows:

**California Class**: All California residents from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the three years preceding the filing of this complaint to the date of final judgment.

**Ohio Class**: All Ohio residents from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the four years preceding the filing of this complaint to the date of final judgment.

**Wisconsin Class**: All Wisconsin residents from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the two years preceding the filing of this complaint to the date of final judgment.

**Texas Class**: All Texas residents from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the two years preceding the filing of this complaint to the date of final judgment.

**RICO Class**: All residents of the United States from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the four years preceding the filing of this complaint to the date of final judgment.

84.    At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

85.    There are numerous common questions of law and fact common to Plaintiffs and members of the Classes. These questions include but are not limited to the following:

a.    Whether Defendants violated state usury laws;

b.    Whether Defendants are protected by tribal sovereign immunity;

c. Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law;

d. Whether Defendants were unjustly enriched; and

e. The proper measure and amount of damages for the Classes.

86. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

87. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who have significant experience litigating complex class actions. Plaintiffs and her counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Classes.

88. The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

89. The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a. Absent a class action, class members as a practical matter will be unable to

obtain redress; Defendants' violations will continue without remedy; and additional consumers will be harmed.

b.      It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.      A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.      The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.      Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

**COUNT ONE:**
**Violation of California Usury Laws**
**(On Behalf of Plaintiff Cumming and the California Class Against All Defendants)**

90.      Plaintiff Cumming restates each of the allegations in the preceding paragraphs as if set forth at length herein.

91.      All of the loans made to California consumers in the name of Big Picture used an interest rate greater than 10%.

92.      Accordingly, Plaintiffs and the class members are entitled to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

**COUNT TWO:**
**Violation of Ohio Usury Laws**
**(On Behalf of Plaintiff Kondo and the Ohio Class Against All Defendants)**

93.      Plaintiff Kondo restates each of the allegations in the preceding paragraphs as if set forth at length herein.

94.      Under Ohio's small loan law and newly enacted Consumer Installment Loan Act, a person or business operating without a license from the Ohio Division of Financial Institutions may not charge interest in excess of the general maximum amount of interest available under state law.

Ohio Code § 1321.02; § 1321.63(a). The generalized maximum rate of interest under Ohio law is 8%. Ohio Code § 1343.01(A).

95.     On information and belief, Defendants do not possess the requisite lending licenses, in violation of Ohio Code §§ 1321.02 and 1321.63(a). Thus, the loans to Plaintiff Kondo and the Ohio Class are void, and Defendants have "no right to collect, receive, or retain any principal, interest, or charges." Ohio Code §§ 1321.02, 1321.63.

96.     Even *licensed* lenders making small loans of $5,000 or less in Ohio are subject to strict interest rate ceilings. Licensed lenders may contract for interest rates of up to 28% on the portion of principal not exceeding $1,000, and up to 22% on the portion of principal exceeding $1,000. Ohio Code § 1321.13. And the newly enacted Ohio Consumer Installment Loan Act provides an interest rate ceiling of 25%. Ohio Code § 1321.68.

97.     Ohio's small loan law and Consumer Installment Loan Act both render void any loans made in violation of the laws, and a lender violating the law "has no right to collect, receive, or retain any principal, interest, or charges." Ohio Code §§ 1321.02, 1321.63.

98.     Willful violators of Ohio's small loan law are liable to borrows for twice the amount of interest contracted for. Ohio Code §§ 1321.14(D).

99.     Defendants entered into usurious contracts with Plaintiff Kondo and the Ohio Class by charging interest rates well in excess of any applicable APR, whether 8%, 22%, 25%, or 28%. Thus, Defendants are liable to Plaintiff Kondo and the Ohio Class for twice the amount of interest collected. Ohio Code §§ 1321.14(D).

## COUNT THREE:
### Violation of Texas Usury Laws
**(On Behalf of Plaintiff Mendez and the Texas Class Against All Defendants)**

100.     Plaintiff Mendez restates each of the allegations in the preceding paragraphs as if set forth at length herein.

101.     All of the loans made to Texas consumers in the name of Big Picture used an interest rate greater than 10%.

102.     Accordingly, Plaintiff Mendez and the Texas Class members are entitled to recover

the greater of (a) three times the interest charged in excess of 10%, or (b) the lesser of $2,000 or 20% of the principal.

103.     Additionally, because Defendants charged Plaintiff Mendez and the Texas Class members greater than twice the authorized amount (10%), Plaintiff Mendez and the Texas Class are also entitled to recover the principal amount and the interest and any other charges or fees. Tex. Fin. Code § 305.002.

**COUNT FOUR:**
**Violation of Wisconsin Usury Laws**
**(On Behalf of Plaintiff Wangeline and the Wisconsin Class Against All Defendants)**

104.     Plaintiff Wangeline restates each of the allegations in the preceding paragraphs as if set forth at length herein.

105.     All of the loans made to Wisconsin consumers in the name of Big Picture used an interest rate greater than either 6% or 12%.

106.     Accordingly, Plaintiff Wangeline and the Wisconsin Class members are entitled to recover all interest and charges, and up to $2,000 in principal. Wis. Stat. § 138.06.

**COUNT FIVE:**
**Violation of RICO—18 U.S.C. §§ 1962(c) & (d)**
**(On Behalf of Plaintiffs and the RICO Class Against All Defendants)**

107.     Plaintiffs reallege and incorporates by reference each and every allegation set forth in the preceding paragraphs.

108.     Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

109.     The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Defendants, are an association in fact "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Big Picture Loans and its predecessors.

110.     The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

111.     Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in

the conduct of the Enterprise's affairs in the collection of unlawful debt.

112.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

113.     All of the loans made to California, Ohio, Texas, and Wisconsin residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in those states. Further, Defendants' loans to RICO Class members included interest rates in excess of twice the enforceable rate under the applicable state laws.

114.     Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

115.     Plaintiffs and RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

116.     This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future to the detriment of members of the RICO Class.

117.     Accordingly, Defendants are jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### COUNT SIX:
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Classes Against All Defendants)

118.     Plaintiffs realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

119.     To the detriment of Plaintiffs and Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates.

120.     As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiffs seek a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including the following:

a.     An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

b.     An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

c.     An Order declaring that Defendants have committed the violations of law alleged herein;

d.     An Order providing for any and all injunctive relief the Court deems appropriate;

e.     An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

f.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

g.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

h.     An Order awarding Plaintiffs reasonable costs and expenses of suit, including attorneys' fees; and

i.     Any further relief the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

By: */s/ Hassan A. Zavareei*

Hassan A. Zavareei (SBN 181547)
Anna C. Haac (to be admitted *pro hac vice*)
Andrew J. Silver (to be admitted *pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
hzavareei@tzlegal.com
ahaac@tzlegal.com
asilver@tzlegal.com

Tanya Koshy (SBN 277095)
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA 94607
Phone: 510-254-6808
Fax: 202-973-0950
apersinger@tzlegal.com
tkoshy@tzlegal.com

*Counsel for Christine Cumming, Lamesha Kondo, Andrea Mendez, and Tammy Wangeline, on behalf of themselves and all individuals similarly situated*